THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| R. WAYNE KLEIN, as Receiver,<br><br>Plaintiff,<br>v.<br><br>STACY CURTIS SNOW, an individual,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER DENYING RECEIVER'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00757-DN-PK<br><br>District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

This is an ancillary action to *United States v. RaPower-3, LLC et al.*, 2:15-cv-00828-DN-DAO (D. Utah) ("Civil Enforcement Case") which found that RaPower-3, LLC, and individuals and entities aligned with it conducted a fraudulent tax avoidance scheme for the benefit of Neldon Johnson ("Johnson") and his family, and entities they controlled.[1] Following the Civil Enforcement Case, R. Wayne Klein was appointed as Receiver ("Receiver") of RaPower-3, LLC ("RaPower"), International Automated Systems Inc. ("IAS"), LTB1, LLC ("LTB1"), their subsidiaries and affiliates,[2] referred to as "Receivership Entities," and the assets of Johnson and R. Gregory Shepard ("Shepard").[3]

The Receiver's Complaint in this ancillary case asserts six causes of action against Defendant Stacy Curtis Snow ("Snow").[4] The Receiver alleges that the Receivership Entities

---

[1] *See* Findings of Fact and Conclusions of Law ("FFCL"), ECF no. 467 in Civil Enforcement Case, Case No. 2:15-cv-00828-DN, filed Oct. 4, 2018.

[2] Collectively, unless stated otherwise, RaPower, IAS, LTB1, and all subsidiaries and affiliated entities are referred to herein as "Receivership Entities." The subsidiaries and affiliated entities are: Solco I, LLC ("Solco"); XSun Energy, LLC ("XSun"); Cobblestone Centre, LC ("Cobblestone"); LTB O&M, LLC; U-Check, Inc.; DCL16BLT, Inc.; DCL-16A, Inc.; N.P. Johnson Family Limited Partnership; Solstice Enterprises, Inc.; Black Night Enterprises, Inc.; Starlite Holdings, Inc.; Shepard Energy; and Shepard Global, Inc.

[3] Collectively, RaPower, IAS, LTB1, Shepard, and Johnson are referred to herein as the "Receivership Defendants."

[4] Complaint at 7–12, docket no. 2, filed Oct. 15, 2019.

fraudulently transferred stock shares and money to Snow, with the intent to hinder, delay, or defraud the creditors of Receivership Defendants, in exchange for participation in the fraud.[5]

The Receiver seeks summary judgment on his first cause of action, arguing the transfers to Snow are voidable because they were made with actual or constructive fraud.[6] Snow opposes the Receiver's Motion.[7] Because summary judgment in favor of the Receiver and against Snow is not appropriate at this time, the Receiver's Motion for Summary Judgment is DENIED.

TABLE OF CONTENTS

UNDISPUTED MATERIAL FACTS ........................................................................................... 3
   The Receivership Defendants' fraudulent scheme ..................................................... 3
   The Civil Enforcement Case against the Receivership Defendants ........................... 5
   Snow's involvement with the Receivership Defendants ............................................ 7
   Financial condition of certain Receivership Entities ................................................. 8
DISCUSSION ................................................................................................................ 9
   Judicial notice of the findings in the Civil Enforcement Case is allowed and those findings may be used in this ancillary proceeding ...................................................................... 10
   The Receiver is not entitled to summary judgment ................................................. 12
      The Receiver has not identified which payments were made in the course of the solar panel scheme. ................................................................................................. 13
      Snow has raised a dispute of material fact about whether the Receivership Entities received reasonably equivalent value for his work. ............................................... 18
ORDER ....................................................................................................................... 20

---

[5] *Id*. ¶¶ 33–40 at 7–8; Receiver's Motion for Summary Judgment ("Motion") at 2, docket no. 28, filed Nov. 9, 2021.

[6] Motion at 14.

[7] Defendant's Memorandum in Opposition to Motion for Summary Judgment ("Opposition"), docket no. 32, filed Dec. 26, 2021.

## UNDISPUTED MATERIAL FACTS[8]

### The Receivership Defendants' fraudulent scheme

1. Johnson claimed to have invented solar energy technology, which involves solar lenses placed in arrays on towers.[9]

2. To make money from this purported technology, Johnson sold a component of the technology: the solar lenses.[10]

3. Through a multi-level marketing model (using affiliated entity RaPower), lenses were sold to hundreds of investors across the nation.[11]

4. IAS or RaPower agreed to build solar towers and install the customers' lenses at a site determined by IAS or RaPower.[12]

---

[8] Those facts, or portions thereof, identified in the parties' briefing that do not appear in these Undisputed Material Facts are either disputed; not supported by cited evidence; not material; or are not facts, but rather, are characterization of facts or legal argument. Additionally, self-serving and conclusory assertions within an affidavit or declaration are not accepted for purposes raising a genuine dispute of a material fact. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). Unless otherwise noted, any citations in the statement of undisputed material facts to the record in the Civil Enforcement Case use "ECF no." while citations to "docket no." refer to the record filed in this action.

[9] *See* Pl. Ex. 579, Deposition Designations for Neldon Johnson, vol. 1, ("Johnson Dep., vol. 1") 134:19-135:2 (June 28, 2017), ECF no. 252-20, filed Nov. 17, 2017; Pl. Ex. 509 at video clip 12_4_38-5_15 ("Pl. Ex. 509"), ECF no. 256-3, filed Nov. 17, 2017; Johnson Dep., vol. 1, 87:16-91:1; Pl. Ex. 509 at video clip 12_4_00-4-23; Johnson Dep., vol. 1, 139:23-144:19.

[10] *See* Pl. Ex. 682, Deposition Designations for RaPower-3, LLC ("RaPower-3 Dep.") 36:4-39:8 (June 30, 2017), ECF no. 252-32, filed Nov. 17, 2017.

[11] RaPower-3 Dep. 32:16-33:14, 36:4-39:8; Pl. Ex. 581, Deposition Designations for International Automated Systems, Inc., ("IAS Dep."), 23:22–25:22 (June 29, 2017), ECF no. 252-21, filed Nov. 17, 2017; Pl. Ex. 8A at 9, ECF No. 254-3, filed Nov. 17, 2017; Pl. Ex. 669, ECF no. 246, filed Nov. 2, 2017; Pl. Ex. 742A, ECF no. 331-1, filed under seal Mar. 9, 2018; Pl. Ex. 742B, ECF No. 331-2, filed under seal Mar. 9, 2018; Pl. Ex. 749; Gov. Ex. BK0001, T. 858:12-863:16.

[12] Pl. Ex. 462, ECF no. 255-29, filed Nov. 17, 2017; Pl. Ex. 673, Deposition Designations for LTB1, LLC, ("LTB1 Dep.") 43:16-46:24 (July 1, 2017), ECF no. 252-28, filed Nov. 17, 2017; Pl. Ex. 464 at 2, ECF no. 255-31, filed Nov. 17, 2017; Ex. 94¶ 3, ECF no. 254-26, filed Nov. 17, 2017; Pl. Ex. 511 at 1, ECF no. 252-16, filed Nov. 17, 2017; Pl. Ex. 685, Deposition Designations for R. Gregory Shepard ("Shepard Dep."), 157:18-24 (May 22, 2017), ECF no. 256-27, filed Nov. 17, 2017; Pl. Ex. 119 at 1, ECF no. 254-31, filed Nov. 17, 2017.

5.     When customers purchased lenses, the customers also signed an operations and maintenance agreement with LTB1, with LTB1 agreeing to operate and maintain the customers' lenses to produce revenue.[13]

6.     LTB1 was to make quarterly payments to the lens purchasers, representing a portion of the revenues earned from the operation of the solar lenses.[14]

7.     Johnson illustrated his idea as follows:[15]



---

[13] Pl. Ex. 94 at 2, ECF no. 254-26, filed Nov. 17, 2017, Pl. Ex. 121, ECF no. 254-32, filed Nov. 17, 2017; Pl. Ex. 25 at 1, ECF no. 254-9, filed Nov. 17, 2017; Pl. Ex. 557 at 1, ECF no. 256-12, filed Nov. 17, 2017; Pl. Ex. 473, ECF no. 255-37, filed Nov. 17, 2017; Pl. Ex. 533 at 2, ECF no. 256-9, filed Nov. 17, 2017.

[14] Pl. Ex. 121 at 4, ECF no. 254-32, filed Nov. 17.

[15] IAS Dep. 162:1-165:9; Pl. Ex. 532 at 6, ECF no. 252-19, filed Nov. 17, 2017; *see also* Pl. Ex. 531, ECF no. 252-18, filed Nov. 17, 2017; LTB1 Dep. 71:25-74:21, 88:7-17.

8. The Receivership Defendants advertised substantial returns and tax benefits in exchange for only a down payment on the solar lenses:[16]



**The Civil Enforcement Case against the Receivership Defendants**

9. On November 23, 2015, the United States filed the Civil Enforcement Case against the Receivership Defendants alleging that they were operating a fraudulent solar energy scheme.[17]

10. The Receivership Defendants sold solar lenses emphasizing their purported tax benefits. Customers were told that they could "zero out" their federal income tax liability by

---

[16] Plaintiff's Trial Exhibits 496, 497, and 777 in Civil Enforcement Case, docket no. 28-3, filed Nov. 9, 2021.

[17] Complaint for Permanent Injunction and Other Equitable Relief, ECF no. 2, filed Nov. 23, 2015.

buying enough solar lenses and claiming both a depreciation deduction and solar energy tax credit for the lenses.[18]

11. The purported solar energy technology and solar lenses, however, did not work to generate marketable energy. Specifically, the purported solar energy technology is not now, has never been, and never will be a commercial-grade solar energy system that converts sunlight into electrical power or other useful energy and the solar lenses do not, either on their own or in conjunction with other components, use solar energy to generate marketable electricity.[19]

12. None of these solar lenses ever met the necessary elements to qualify for depreciation deductions or the solar energy tax credit. Indeed, "[h]undreds, if not thousands" of customer lenses were not even removed from the shipping pallets.[20]

13. Notwithstanding the fact the solar lenses and technology never worked to generate marketable energy, the Receivership Defendants continued to sell solar lenses to customers emphasizing that customers would qualify for depreciation deductions and/or the solar energy tax credit. Between 45,205 and 49,415 solar lenses were sold to customers.[21]

14. The Receivership Defendants' own transaction documents and testimony at trial in the Civil Enforcement Case showed that the gross receipts received by the Receivership Defendants were at least $31,312,155 and possibly much more.[22]

---

[18] Johnson Dep., vol. 1, 247:11-248:12; Pl. Ex. 490 at 9-10, ECF no. 255-40, filed Nov. 17, 2017; *see also* IAS Dep. 162:1-165:9; Pl. Ex. 531, ECF no. 256-7, filed Nov. 17, 2017; Pl. Ex. 24 at 1, ECF no. 252-3, filed Nov. 17, 2017; *see also* Pl. Ex. 20 at 2, ECF no. 254-7, filed Nov. 17, 2017; *see* Pl. Ex. 693, Deposition Designations for Frank Lunn, IV ("Lunn Dep.") 188:18-189:20. (Aug. 1, 2016), ECF no. 256-33, filed November 17, 2017.

[19] T. 49:23-50:7, 111:17-112:10.

[20] *See* Shepard Dep. 39:13-42:5, 60:21-61:17; Pl. Ex. 460, ECF no. 255-28, filed Nov. 17, 2017; T. 102:2-21.

[21] Pl. Ex. 742A; Pl. Ex. 742B.

[22] Pl. Ex. 735, ECF No. 370-2, filed April 2, 2018; T. 863:18-868:24; Pl. Ex. 738, ECF No. 370-5, filed April 2, 2018; T. 869:1-25; Pl. Ex. 852 at 59; T. 257:7-258:20, 271:9-272:12, 293:1-294:11, 312:5-15; Pl. Ex. 371; Pl. Ex. 507 at 20, 35, ECF No. 351-15, filed March 26, 2018; T. 1812:4-12.

15. Based on these facts and others, the court enjoined the Receivership Defendants in the Civil Enforcement Case from promoting their abusive solar energy scheme; ordered them to disgorge their gross receipts; and required them to turn over their assets and business operations to the Receiver.[23]

### Snow's involvement with the Receivership Defendants

16. Snow worked full time for IAS from May 1992 through August 2008.[24]

17. Snow was a member of the board of directors of IAS from June 1996 to January 2006, and again from September 2010 to August 2012.[25]

18. Snow worked as a mechanical engineer for IAS.[26]

19. Snow performed work on several IAS projects other than the solar lens project, including "[a]utomated scanning till system, biometric pickup device, automated controlled substance vending machine, automated food ordering restaurant . . . ."[27]

20. Snow received transfers from Receivership Entities from 2005 to 2016 in the amount of $164,720.64.[28]

21. Snow was issued shares of IAS Stock.[29]

---

[23] Affiliates Order ¶ at 4–5; Memorandum Decision and Order Freezing Assets and to Appoint a Receiver ("Freeze Order"), ECF no. 444 in Civil Enforcement Case, filed Aug. 22, 2018, docket no. 28-6, filed Nov. 9, 2021.

[24] Declaration of Stacy Curtis Snow in Opposition to Motion for Summary Judgment ("Snow Decl.") ¶ 2 at 1, docket no. 32-1, filed Dec. 26, 2021.

[25] Receiver's Declaration in Support of Motion for Summary Judgment ("Receiver Decl.") ¶ 8 at 4, docket no. 28-4, filed Nov. 9, 2021; Snow Decl. ¶ 19 at 4; *see also* Opposition at 9.

[26] Snow Decl. ¶ 3 at 1; Reply Memorandum in Support of Receiver's Motion for Summary Judgment ("Reply") at 3, docket no. 36, filed Jan. 24, 2022.

[27] Snow Decl. ¶ 3 at 1; Reply at 3.

[28] Motion ¶ 31 at 10; Motion, Exhibit G ("Payments Exhibit"), docket no. 28-8, filed Nov. 9, 2021. Snow does not dispute the amount of the transfers he received from IAS, he just asserts what the payments were for. Opposition at 9–10.

[29] Motion ¶¶ 32, 34 at 10–11; Opposition at 10.

22. Proceeds to Snow from sale of his IAS stock totaled $82,397.21.[30]

## Financial condition of certain Receivership Entities

**IAS**

23. IAS was a public company and filed annual reports that included audited financial statements. The most recent annual report filed by IAS was for 2016. In that report, IAS indicated that it had $0.00 of revenue for the most recent fiscal year.[31]

24. IAS indicated that as the date of its annual report for 2016, it had "not marketed any commercially acceptable products" and "will continue to need additional operating capital either from borrowing or from the sale of additional equities."[32]

25. IAS also indicated that "[s]ince inception, we have incurred operating losses each year of our operations and we expect to continue to incur operating losses for the next several years. We may never become profitable."[33]

26. As of June 30, 2016, IAS indicated that it had accumulated deficits of $40,156,398 with only $3,997,445 in total assets.[34]

27. IAS's annual report for 2016 also states that "[t]he accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As

---

[30] Motion, Exhibit J, docket no. 28-11, filed Nov. 9, 2021; Opposition at 11. Snow does not dispute the amount he received from sale of stock, but asserts that receipt and sale of shares are not a transfer subject to the UFTA, and that the shares he received were for compensation of services and "was often used to provide capital to IAS to finance operations for IAS." Snow Decl. ¶¶ 15–18 at 3.

[31] Motion, Exhibit K, IAS Annual Report for fiscal year ended June 30, 2016 ("IAS Annual Report") at 2, docket no. 28-12, filed Nov. 9, 2021..

[32] *Id*. at 12.

[33] *Id*. at 15.

[34] *Id*. at 21–22.

discussed in Note 1 to the financial statements, the Company has suffered recurring losses from operations that raises a substantial doubt about its ability to continue as a going concern."[35]

**RaPower**

28.	RaPower's revenue came from the sale of solar lenses.[36]

29.	Johnson's technology never generated marketable electricity or revenue from the sale of power.[37]

## DISCUSSION

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[38] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way"[39] or "if a reasonable jury could return a verdict for the nonmoving party."[40] A fact is material if "it is essential to the proper disposition of [a] claim."[41] And in ruling on a motion for summary judgment, the factual record and all reasonable inferences drawn therefrom are viewed in a light most favorable to the nonmoving party.[42]

---

[35] *Id*. at 37.

[36] Pl. Ex. 8A at 9, ECF No. 254-3, filed Nov. 17, 2017; Pl. Ex. 749; T. 758:10-793:2; Motion, Statement of Undisputed Material Facts ¶ 45 at 12; Opposition at 13.

[37] T. 49:23-50:7, 111:17-112:10; Johnson Dep., vol. 1, 230:4-11. This fact is not disputed by Snow's assertions that he has seen the technology capture heat and that he had "personally observed success in several different components of the solar energy technology." Snow Decl. ¶ 4 at 2; *see also* Opposition at 13.

[38] Fed. R. Civ. P. 56(a).

[39] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[40] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (internal quotations omitted).

[41] *Adler*, 144 F.3d at 670.

[42] *Id.*

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[43] If the moving party carries this initial burden, the nonmoving party "may not rest upon mere allegations or denials of [the] pleading[s], but must set forth *specific facts* showing that there is a *genuine issue* for trial as to those dispositive matters for which it carries the burden of proof."[44] "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient to defeat a properly supported motion for summary judgment."[45]

### Judicial notice of the findings in the Civil Enforcement Case is allowed and those findings may be used in this ancillary proceeding

Snow challenges the Receiver's use of findings of fact from the Civil Enforcement Case, arguing that he was "not a party to that proceeding and the Plaintiff is estopped from reliance on the [c]ourt's findings in this case."[46] Snow is correct that the findings of fact in the Civil Enforcement Case are not binding here. However, the record in the Civil Enforcement Case can be incorporated into this case for two reasons.

First, this action—along with other actions brought by the Receiver— is ancillary to, and arose directly from, the Civil Enforcement Case.[47] The orders in the Civil Enforcement Case and their findings with the evidence cited to support them provide the basis for the existence of the receivership, including findings that Receivership Defendants promoted and operated an abusive tax scheme centered on purported solar energy technology; that the solar energy technology did not work; and that the Receivership Defendants' solar scheme was not a legitimate business.

---

[43] *Id.* at 670-71.

[44] *Universal Money Ctrs., Inc.*, 22 F.3d at 1529 (internal quotations and citations omitted; emphasis in original).

[45] *Id.* (internal quotations omitted).

[46] Opposition at 6. Snow does not make any evidentiary objection to the incorporation of the record in the Civil Enforcement Case, but rather only argues that claim preclusion is not appropriate in this case.

[47] General Order No. 19-003, Oct. 18, 2019 (D. Utah).

These findings were made against the Receivership Defendants after a 12-day bench trial and were affirmed by the Tenth Circuit Court of Appeals.[48]

In the receivership context, courts often incorporate the factual record of an underlying case into ancillary actions.[49] The ability of district courts to use such materials is an important tool in receiverships because the existing record reduces the time necessary to settle disputes, decrease litigation costs, avoid duplication of work, and avoid inconsistent decisions.[50] The use of the record and undisputed findings from the underlying action avoids the expense, distraction, and complexity of relitigating undisputed—and appeal-affirmed—findings. District courts have broad discretion in their supervisory role over equity receiverships involving numerous parties and complex transactions.[51] Indeed, it seems doubtful at best that equitable receiverships would function if a court was forced to relitigate the factual basis for the receivership every time an ancillary action was litigated; especially when, as here, the defendant does not produce any evidence to challenge the factual record and findings in the underlying action.

Second, judicial notice of the record in the Civil Enforcement Case under Federal Rule of Evidence 201 is also appropriate. In the summary judgment context, federal courts may "take judicial notice, whether requested or not, of its own records and files, and facts which are part of its public records."[52] "Judicial notice is particularly applicable to the court's own records of prior

---

[48] FFCL at 1; *United States v. RaPower-3, LLC*, 960 F.3d 1240, 1243 (10th Cir. 2020).

[49] *See, e.g., Hafen v. Evans*, No. 2:19-CV-00895-TC, 2021 WL 3501658, at *1 (D. Utah Aug. 9, 2021).

[50] *Elliott,* 953 F.2d at 1566 (citing *SEC v. Wencke,* 783 F.2d 829, 837 (9th Cir. 1986)). These reasons are also why all actions arising from the Civil Enforcement Case were ordered to be heard by the District Judge that presided over the Civil Enforcement Case. General Order, No. 19-003.

[51] *SEC v. Vescor Capital Corp.*, 599 F.3d 1189, 1194 (10th Cir. 2010) (district courts have "broad powers and wide discretion to determine relief in an equity receivership."); *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005); *Fed. Trade Comm'n v. Noland*, No. CV-20-00047-PHX-DWL, 2020 WL 4530459, at *7 (D. Ariz. Aug. 6, 2020) (discussing the need to avoid distracting satellite litigation in a receivership).

[52] *St. Louis Baptist Temple v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("a district court may utilize the doctrines underlying judicial notice in hearing a motion for summary judgment substantially as they

litigation closely related to the case before it."[53] Therefore, the record in the Civil Enforcement Case will be construed as part of the record in this case.

To be clear, the findings of fact in the Civil Enforcement Case are not *binding* on Snow. However, because Snow presents no evidence to challenge the undisputed facts and the record evidence from the Civil Enforcement Case which are incorporated here, there is no need to "grind the same corn a second time."[54] The factual findings in the Civil Enforcement Case that Snow has failed to challenge with evidence are made again in this case, for the purpose of this Order, as reflected in the Undisputed Material Facts, *supra*.

### The Receiver is not entitled to summary judgment

The Receiver seeks summary judgment on "his securities violations claims."[55] But the Receiver did not allege any securities violations claims in the Complaint[56] and never tried to amend the Complaint to add such claims. So, the securities violations arguments are disregarded and the Receiver's Motion for summary judgment regarding those nonexistent claims is DENIED.

The Receiver also seeks summary judgment on his first fraudulent transfer claim[57] under the Uniform Voidable Transactions Act ("UVTA")[58] against Snow in the amount of $247,117.85

---

would be utilized at trial."); *Anderson v. Cramlet*, 789 F.2d 840, 845 (10th Cir. 1986); *Van Woudenberg v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001); *United States v. Ahidley*, 486 F.3d 1184, 1192 (10th Cir. 2007).

[53] *St. Louis Baptist Temple*, 605 F.2d at 1172.

[54] See *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277 n.33 (5th Cir. 1978) (quoting *Aloe Creme Laboratories v. Francine Co.*, 425 F.2d 1295, 1296 (5th Cir. 1970)).

[55] Motion at 3.

[56] Complaint at 7–12.

[57] Motion at 2.

[58] The UVTA became effective on May 9, 2017. The governing law prior to the UVTA was the Uniform Fraudulent Transfer Act. The statutes are substantially similar; any differences do not affect the disposition of the Receiver's Motion for Summary Judgment. The statutes are referred to collectively herein as the UVTA, but citations to both statutes are given.

plus prejudgment interest.[59] The claims are to recover transfers made by the Receivership Entities which were purportedly made for work done by Snow.[60] Summary judgment in favor of the Receiver and against Snow on the Receiver's first cause of action—finding the transfers were made with "actual intent to hinder, delay, or defraud"[61]—is not appropriate at this time because: (1) the Receiver has failed to identify which payments to Snow were made for work on the solar panel scheme; and (2) Snow has raised a genuine dispute of material fact regarding whether he provided reasonably equivalent value for some of the transfers.

**The Receiver has not identified which payments were made in the course of the solar panel scheme.**

Pursuant to the UVTA, a transfer is voidable if the debtor made the transfer with "actual intent to hinder, delay, or defraud *any* creditor of the debtor."[62] To determine if a transfer is made with actual intent to hinder, delay, or defraud, courts will: (1) examine the knowledge of the transferors and the purpose of the transfer;[63] and (2) look at a variety of other factors, including the badges of fraud set forth in § 202 of the UVTA.[64]

In these circumstances, the Receivership Entities are the debtors, and the Receivership Estate is the creditor. During the time transfers were made, when the Receivership Entities were "evil zombies" under the control of Johnson, they were acting as debtors. Currently, now that the "spell" has been broken, the Receivership Estate, standing in the shoes of those entities which

---

[59] Motion at 3, 26.

[60] Motion at 2; Snow Decl. ¶ 7 at 2.

[61] Utah Code Ann. § 25-6-202(1)(a); Utah Code Ann. § 25-6-5(1)(a) (2016).

[62] Utah Code Ann. § 25-6-202(1)(a) (emphasis added); Utah Code Ann. § 25-6-5(1)(a) (2016).

[63] *In re Independent Clearing House Co.*, 77 B.R. 843, 860 (D. Utah 1987).

[64] Utah Code Ann. § 25-6-202(2).

have been removed from the control of Johnson, is the injured party and serves as a defrauded creditor.[65]

The knowledge of the transferors need not be addressed because the Receiver fails to delineate which asserted badges of fraud should apply to which payments made to Snow, and Snow raises a dispute of material fact about whether all payments were made in furtherance of the solar panel scheme. For these reasons, there can be no clear finding of "actual intent to hinder, delay, or defraud" at this stage of the proceedings.

The badges of fraud which the Receiver claims are present in this case are largely tied to the solar panel scheme, and include:

- The Receivership Defendants had been sued or threatened with suit before some of the payments to Snow, as the Internal Revenue Service executed a criminal search warrant of Receivership Defendants in June 2012.[66]

- The Receivership Defendants were insolvent.[67]

- The Receivership Defendants have removed or concealed assets and records.[68]

- The Receivership Defendants falsified documents to cover up their fraud.[69]

- The Receivership Entities did not receive reasonably equivalent value in return for the transfers.[70]

- Snow was an insider of IAS because he served as a director of IAS from 2003 to 2010.[71]

---

[65] *Klein v. Cornelius*, 786 F.3d 1310, 1317 (10th Cir. 2015) (quoting *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir.1995)).

[66] Motion at 17.

[67] *Id*.

[68] *Id*.

[69] *Id*. Falsification of documents is not specifically identified in the statute's non-exhaustive list of badges of fraud.

[70] *Id*.

[71] *Id*. The Receiver originally asserted that Snow was a director of IAS from June 1996 to January 2006, and again from September 2010 to August 2012, and Snow agrees. Receiver Decl. ¶ 8 at 4; Snow Decl. ¶ 19 at 4; *see also* Opposition at 9. It appears the Receiver made an error in the span of dates in this badge of fraud. For the purposes of

However, the Receiver has not shown that all payments made to Snow, or even which payments, were made in furtherance of the solar panel scheme. The payments the Receiver claims are fraudulent took place between 2005 and 2016.[72] Many of the badges of fraud do not clearly apply to the earlier payments, including:

- The Receiver alleges that the Receivership Defendants were not sued or threated with suit until June 2012, close to the very end of the allegedly fraudulent transfers.[73] The Receiver does not explain why the threat of suit in June 2012 should apply to any payments made before that date.

- The Receivership Defendants were insolvent. The Receiver cites to the Findings of Fact in the Civil Enforcement Case and the IAS Annual Report from fiscal year ended June 30, 2016 ("IAS Annual Report")[74] to support his assertion.[75] However, there was no clear finding of insolvency in the Civil Enforcement Case[76] and only three payments to Snow occurred during the fiscal year ending June 30, 2016.[77] Snow's failure to adequately dispute the Receiver's assertions of the Receivership Defendants' insolvency[78] does not absolve the Receiver of his burden to show to what payments the badge of insolvency should apply.

---

this motion, the dates Snow was an insider is from June 1996 to January 2006, and then from September 2010 to August 2012.

[72] Complaint, Exhibit A, docket no. 2-1, filed Oct. 15, 2019.

[73] Motion at 17.

[74] IAS Annual Report.

[75] Motion at 18, n.79.

[76] See FFCL. Additionally, although the record in the Civil Enforcement Case can be incorporated into this opinion, it is less clear whether the Findings of Fact and Conclusions of Law themselves can be.

[77] Payments Exhibit.

[78] Opposition ¶¶ 40–44 at 11–13.

Some of the badges of fraud are clearly not applicable to *any* of the payments made to Snow because they appeared after all payments were made to Snow. The Receivership Defendants made payments to Snow between 2005 and 2016.[79] Two of the alleged badges of fraud, specifically that the Receivership Defendants (1) removed or concealed assets and records and (2) falsified documents, occurred after entry of the Corrected Receivership Order ("CRO"), which was entered on November 1, 2018.[80] The Receiver does not explain why those badges of fraud should apply to Snow's payments, which preceded entry of the CRO.

Snow has raised a material issue of fact regarding whether reasonably equivalent value was given in return for the transfers, so that badge of fraud will be addressed below.

This leaves just one badge of fraud asserted by the Receiver; namely, Snow's status as an insider of two of the Receivership Entities. The parties agree that Snow was a member of the board of directors of IAS from June 1996 to January 2006, and again from September 2010 to August 2012.[81] Payments occurred after Snow resigned from the Board in August 2012, so this badge does not apply to every payment made to Snow.[82]

---

[79] Exhibit A; Payments Exhibit.

[80] Civil Enforcement Case, ECF no. 491; *see also* Affiliates Order at 5; Memorandum Decision and Order Granting Turnover Motion; Denying Motion to Strike; Overruling Objection to Authentication of Exhibits; and Overruling Objection to Rejection of Reputed Contract ("Turnover Order") at 41-42, 45-47, ECF no. 1007 in Civil Enforcement Case, filed Sept. 15, 2020, docket no. 28-14, filed Nov. 9, 2021; Civil Contempt Order Re: Neldon Johnson, Glenda Johnson, LaGrand Johnson, and Randale Johnson at 5-9, 11-19, ECF no. 947 in Civil Enforcement Case, filed July 6, 2020, docket no. 28-15, filed Nov. 9, 2021.

[81] Receiver Decl. ¶ 8 at 4; Snow Decl. ¶ 19 at 4; *see also* Opposition at 9.

[82] Exhibit A; Payments Exhibit.

In response to Snow's new assertion that he gave the proceeds from the sale of his IAS stock back to IAS to pay operating costs for IAS (contrary to his discovery responses), the Receiver raises additional badges of fraud in his Reply:[83]

- The Receivership Defendant IAS retained possession or control of the property transferred after the transfer.[84]

- The transfer or obligation (payments to Snow) was disclosed or concealed,[85] because "the act of giving the shares to Snow to sell and provide the proceeds to IAS is a method to conceal the transfers and a scheme to avoid registration of shares and to avoid IAS's (and Johnson's) obligation to report these as share proceeds received by IAS and Johnson."[86]

- The Receivership Defendant IAS removed or concealed assets:[87] "By issuing shares to Snow to be later sold under IAS's control, IAS removed and concealed assets."[88]

- Snow's false statements in IAS's Form S-8 filed with the U.S. Securities and Exchange Commission in June 2005.[89]

These additional badges of fraud, if true, are certainly concerning. However, the Receiver again fails to identify the payments to which these badges should apply.

For all of the badges of fraud asserted against Snow, the Receiver has failed to clearly delineate to which payments those badges apply.

Additionally, Snow has raised a dispute of material fact as to whether all the payments to Snow were made in furtherance of, or were even related to, the solar panel scheme.[90] It does not

---

[83] Reply at 18. The Receiver again asserts that Snow did not provide reasonably equivalent value for the stock because "he sold the stock to give the proceeds to IAS to pay his wages," *id*. at 17, and this argument is addressed below.

[84] *Id*. at 17; Utah Code § 26-6-202(2)(b).

[85] Utah Code § 26-6-202(2)(c).

[86] Reply at 17.

[87] Utah Code § 26-6-202(2)(g).

[88] Reply at 17.

[89] Form S-8, IAS, Exhibit O, docket no. 36-2, filed Jan. 24, 2022; Reply at 17. The Form S-8 states that IAS "will not receive any of the proceeds of sales of such securities." Form S-8 at 10.

[90] Opposition at 22–3; *see also* Snow Decl. ¶ 3 at 1–2.

appear to be disputed that Snow performed other work for the Receivership Entities besides his work on the solar panel scheme.[91] The Receiver does argue that "[t]he work for which Snow was paid wages and bonuses was central to the cover story Receivership Defendants created to perpetuate their fraudulent tax scheme,"[92] but the Receiver does not support this assertion with citations to evidence, and the statement does not clearly dispute that Snow performed other work for the Receivership Entities which was unrelated to the solar panel scheme.

While transfers in exchange for work done to further the fraudulent solar panel scheme (especially post-2012, when the Receivership Entities were first threatened with suit) were almost certainly fraudulent, considering the fraudulent nature of the solar lens scheme, transfers for other work Snow performed for the Receivership Entities may not have been. On this record, there are still questions of material fact regarding whether individual transfers to Snow were fraudulent, and the Receiver has not distinguished or delineated between the individual transfers.[93] A reasonable factfinder could, based on the available evidence, find the Receiver had not established every transfer was fraudulent. Therefore, summary judgment is not appropriate.

**Snow has raised a dispute of material fact about whether the Receivership Entities received reasonably equivalent value for his work**

Even if disputes of material fact did not exist concerning whether all transfers to Snow were fraudulent, a reasonable jury could find that Snow provided reasonably equivalent value in exchange for some of those transfers.

If the Receiver established the transfers were made to Snow with actual intent to hinder, delay, or defraud, the burden shifts to Snow to show that the good faith defense applies because

---

[91] Snow Decl.; Reply at 2–3.

[92] Reply at 16.

[93] This includes the transfer of shares from IAS to Snow. It is unclear from the Receiver's motion what the transfer of stocks was in exchange for.

(1) he took the transfers in good faith, for (2) reasonably equivalent value.[94] The Receiver does not address in his motion whether Snow acted in good faith in receiving the transfers.[95] Therefore, for purposes of the Motion, Snow's good faith is presumed to be met. The relevant issue here is then whether the Receivership Defendants received reasonably equivalent value.

Snow's Opposition includes an affidavit by Snow where he asserts he worked on other projects for IAS that did not include the solar panel scheme. Those projects included an "[a]utomated scanning till system," a "biometric pickup device," an "automated controlled substance vending machine," and an "automated food ordering restaurant."[96] Snow asserts these projects were "successfully designed, produced, manufactured and fully tested and put into service," and that he is "unaware of how they were marketed and/or why they were abandoned or shelved."[97] Snow also attached his resume, which lists these projects under his IAS summary.[98]

"[I]n determining whether reasonably equivalent value was given, the focus is on whether the *debtor received* reasonably equivalent value from the transfer."[99] "In other words, the question is not whether [the transferee] 'gave reasonably equivalent value; it is whether [the debtor] received reasonably equivalent value.'"[100] Snow contends that IAS received reasonably equivalent value from those other projects he performed for IAS besides the solar panel scheme, such as the automated scanning till and food ordering systems.[101]

---

[94] Utah Code Ann. § 25-6-304; Utah Code Ann. § 25-6-6(1) (2016).

[95] Motion at 20 n.85.

[96] Snow Decl. ¶ 3 at 1.

[97] *Id*. ¶ 3 at 2.

[98] Curtis Snow Resume at 2, docket no. 34-1, filed Jan. 11, 2022.

[99] *Miller v. Wulf*, 84 F. Supp. 3d 1266, 1276 (D. Utah 2015) (emphasis in original).

[100] *Klein v. Michelle Tuprin & Assocs., P.C.*, No. 214CV00302RJSPMW, 2016 WL 3661226, at *7 (D. Utah July 5, 2016) (quoting *Klein v. Cornelius*, No. 2:11-cv-01159-DAK, 2013 WL 6008304, at *3 (D. Utah Nov. 13, 2013)).

[101] Opposition at 22.

The Receiver argues that because IAS stated in public documents that it had "not marketed any commercially acceptable products,"[102] IAS received no value for the work Snow did.[103] But that argument is not persuasive. Merely because a company has not produced a commercially successful product does not mean that it has obtained no value from its engineers' work. A reasonable factfinder could conclude that the work Snow provided in researching and developing products outside the fraudulent scheme was "reasonably equivalent value."

For the transfers that occurred in exchange for Snow's furtherance of the solar panel scheme, it is likely that the Receiver would be able to establish as a matter of law that those transfers were fraudulent at trial. But based on this summary judgment record, it is impossible to tell which transfers were related to the scheme and which transfers were not. Therefore, because Snow has raised a genuine dispute of material fact, the Receiver's Motion will be DENIED.

## ORDER

IT IS HEREBY ORDERED that the Receiver's Motion for Summary Judgment is DENIED.[104]

Signed February 25, 2022.

BY THE COURT:

David Nuffer
United States District Judge

---

[102] IAS Annual Report at 2.

[103] Reply at 3.

[104] Docket no. 28, filed Nov. 9, 2021.